UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

                Plaintiff,

                                        Case No. 24-cr-4-pp

    v.

AUNTRAE BOYD,

                Defendant.

---

**ORDER OVERRULING DEFENDANT'S OBJECTION (DKT. NO. 51),
ADOPTING JUDGE DUFFIN'S RECOMMENDATION (DKT. NO. 48) AND
DENYING DEFENDANT'S MOTION TO SUPPRESS (DKT. NO. 39)**

---

On January 17, 2024, a federal grand jury returned a three-count indictment charging the defendant with (1) possession of firearms and ammunition by a prohibited person in violation of 18 U.S.C. §§922(g)(1) and 924(a)(2), (2) possession with intent to distribute controlled substances (cocaine, oxycodone, fentanyl and methamphetamine) in violation of 18 U.S.C. §§841(a)(1) and (b)(1)(C) and (3) possession of a firearm in furtherance of a drug trafficking offense in violation of 18 U.S.C. §924(c)(1)(A)(i). Dkt. No. 1.

On June 3, 2024, the defendant filed a motion to suppress challenging the scope and validity of two warrants: (1) a warrant to search three vehicles associated with the defendant, including all electronic devices found in those vehicles, and (2) a warrant to search the apartment where the defendant was arrested, including all the electronic devices found in that apartment. Dkt. No. 39 at 1-2. The defendant asks the court to suppress all evidence recovered

from the three vehicles and from all the cell phones seized after execution of the search warrants. Id. Magistrate Judge William E. Duffin has recommended that this court deny the defendant's motion because "a substantial basis existed for concluding there was probable cause that evidence of a crime would be found . . . in the apartment, in the three identified vehicles, and on any cellphone located in these locations." Dkt. No. 48 at 9 (internal citation omitted). After receiving an extension of time, the defendant timely filed an objection to that recommendation. Dkt. No. 51.

After conducting a *de novo* review of the record and the parties' arguments, the court will adopt Judge Duffin's recommendation, dkt. no. 48, and deny the defendant's motion to suppress, dkt. no. 39. There was a "substantial basis" for the judge issuing the disputed warrants to conclude that a search of the three vehicles and the cell phones would uncover evidence of wrongdoing. Based on the information known to law enforcement, the search warrants were sufficiently particular.

## I.    Background

### A.    The Warrant Applications

The defendant provided the court with the applications for the two warrants. One application sought authorization to search "[The defendant's] vehicles, 2020 Gray Nissan and 2019 Gray Volkswagen (further described in Attachment A)." Dkt. No. 39-1 at 1. Attachment A described a gray Nissan, a gray Volkswagen Atlas and a black BMW X6, providing model years and license plate numbers. Id. at 10. The second application sought authorization to

2

search "[the defendant's] property located at [XXX] N. Hopkins St., Unit 124, Milwaukee, WI, (further described in Attachment A)." Dkt. No. 39-2 at 1. "Attachment A" described the physical appearance of the residence. Id. at 39-2. Special Agent John Lindeman of the Bureau of Alcohol, Tobacco and Firearms signed the applications, dating them April 5, 2022 at around 3:20 p.m. Dkt. No. 39-1 at 1; Dkt. No. 39-2 at 1. Both applications stated as the basis for the requested search "evidence of a crime" and "property designed for use, intended for use, or used in committing a crime." Id. Both stated that the search was "related to a violation of" 18 U.S.C. §922(g)(1) (the federal statute prohibiting a person who has been convicted of a felony of possessing a firearm) and 21 U.S.C. §841(a)(1) (the federal statute prohibiting possession of controlled substances with intent to distribute them). Id.

The probable cause sections of the two applications are identical other than the numbering of the paragraphs. In the application for the warrant to search the cars, the numbering is sequential from beginning to end. Dkt. No. 39-1. In the application for the warrant to search the residence, the paragraphs in the "introduction and agent background" section are numbered 1 to 6, then start over at 1 in the "probable cause" section. Dkt. No. 39-2.

The warrant applications aver that on April 5, 2022, members of the U.S. Marshals Service Fugitive Task Force were trying to find the defendant. Dkt. No. 39-1 at ¶7; Dkt. No. 39-2 at 3 (¶1). The applications state that at the time they were made,

> [the defendant] ha[d] two active arrest warrants issued by the
> Milwaukee County Sherriff's [sic] Office. The first Bench Warrant

3

was issued by the Milwaukee Circuit Court on November 23, 2021, in relation to case 2020CF3569. [The defendant] [wa]s charged in this case with Felon in Possession of a Firearm. The second Bench Warrant was issued by the Milwaukee Circuit Court on November 23, 2021, in relation to case 2021CF0316. [The defendant] [wa]s charged in this case with Bail Jumping, Fleeing (Vehicle) and four counts of 2nd Degree Recklessly Endangering Safety.

Dkt. No. 39-1 at 4 (¶7); Dkt. No. 39-2 at 3-4 (¶1).

The applications aver that at about 8:11 a.m. on April 5, 2022, officers knocked and announced themselves at Apartment #124 of an address on North Hopkins Street. Dkt. Nos. 39-1 at 4 (¶8); Dkt. No. 39-2 at 4 (¶2). When officers knocked on Apartment #124's door, a woman named Tyler Stirgus-Harris opened the door. Id. Officers observed the defendant inside the residence, called for him to come out (more than once), then took him into custody without incident. Id.

The applications aver that inside the residence,[1] officers saw on the kitchen counter a Glock model 45, 9mm pistol with an extended magazine and an auto-sear and a SIG model P365, 9mm pistol. Dkt. No. 39-1 at 4 (¶9); Dkt. No. 39-2 at 4 (¶3). The applications provided to this court include a grey-scale (black and white) photo of the two guns surrounded by bottles and some loose change. Id. The applications averred that on the living room couch—located five to six feet from the counter on which the guns were resting—officers observed a baggie containing a green, leafy substance (suspected to be marijuana) and a

---

[1] The defendant says that after he was arrested out in the hallway, officers went into the apartment. Dkt. No. 39 at 2. He says that he asked why they were going into the apartment when they'd already arrested him; he says that the officers spent five to ten minutes performing a protective sweep "despite having no reason to believe anyone else was in the apartment." Id.

baggie containing a tan substance (suspected to be heroin). Dkt. No. 39-1 at 5-6 (¶10); Dkt. No. 39-2 at 6 (¶4). The applications provided to this court also include a grey-scale photo of the items on the couch—in the bottom, left-hand corner are two packages for flavored cigar/cigarette rolling papers; in the center are two plastic sandwich baggies containing unidentifiable material and at the top is what appears to be at least one Apple device. Dkt. No. 39-1 at 7; Dkt. No. 39-2 at 7.

The applications asserted that on the couch next to the suspected drugs were three sets of car keys. Dkt. No. 39-1 at 8 (¶11); Dkt. No. 39-2 at 8 (¶5). They averred that the keys "appeared" to operate a 2020 gray Nissan 4-door sedan with a Florida license plate, a 2019 gray Volkswagen Atlas with a Wisconsin license plate and a 2009 black BMW X6 with a Wisconsin license plate. Id. The applications averred that all three of those vehicles were parked in the parking lot for the apartment complex on North Hopkins Street. Id.

The applications stated that the 2020 Nissan with Florida plates was registered to "Hertz Vehicles, LLC" on Butler National Drive in Orlando, Florida. Dkt. No. 39-1 at 8 (¶12); Dkt. No. 39-2 at 8 (¶6). They averred that the day before the defendant's arrest—April 4, 2022—agents had spoken with the apartment manager, who stated that the manager had seen the defendant driving the Nissan "several times in the last few weeks." Dkt. No. 39-1 at 8 (¶15); Dkt. No. 39-2 at 8 (¶9). The applications stated that agents had spoken to the apartment manager again after law enforcement had taken the defendant into custody; at that time, the manager had "reaffirmed" that the

manager had seen the defendant drive the Nissan "many times in the past few weeks." Id.

The applications stated that the 2019 Volkswagen with Wisconsin plates was registered to Tyler Stirgus-Harris (the woman who'd opened the door when the agents arrived on April 5, 2022) at an address on North 28th Street in Milwaukee. Dkt. No. 39-1 at 8 (¶13); Dkt. No. 39-2 at 8 (¶7). They asserted that in the April 4 and April 5, 2022 interviews of the apartment building manager, the manager had told law enforcement that the manager had seen the defendant drive the Volkswagen "many times in the past few weeks." Id.

The applications averred that the 2009 BMW with Wisconsin plates was registered to an "Isaiah Bonds" on West Juneau Avenue in Milwaukee. Dkt. No. 39-1 at 8 (¶14); Dkt. No. 39-2 at 8 (¶8). The applications did not identify "Isaiah Bonds" or describe any relationship between Bonds and the defendant. The applications stated that during the April 5, 2022 interview with the apartment building manager (the interview that took place after law enforcement arrested the defendant), the manager had stated that the BMW "is related to Apartment 124." Id. They then stated, somewhat confusingly, that "[t]he manager knows this because they have received multiple complaints about how the Volkswagen is parked and Stirgus-Harris has stated that she will take care of the problem." Id. (It is not clear how the building manager would know that the *BMW* was associated with Apartment #124 based on the *Volkswagen* was parked.)

6

The affidavits provided more historical information linking the defendant to the BMW. They averred that a confidential informant had told agents that they'd seen the defendant "drive the BMW in August of 2021." Dkt. No. 39-1 at 9 (¶17); Dkt. No. 39-2 at 9 (¶11). They averred that in October 2021, the Automated License Plate Reader (ALPRs) that the Milwaukee Police Department operates recorded "the BMW parked overnight at the residence of a known girlfriend and mother of one of [the defendant's] children." Dkt. No. 39-1 at 9 (¶18); Dkt. No. 39-2 at 9 (¶12). The applications averred that in "late February 2022," the defendant posted on Facebook a photo of himself from the inside of a BMW; agents knew that the vehicle was a BMW "because the BMW logo is clearly visible in the photo." Dkt. No. 39-1 at 8-9 (¶16); Dkt. No. 39-2 at 9 (¶10). They asserted that in the photo—which was capable of being viewed on Facebook by the public—the defendant had a firearm. Id. Finally, the applications averred that on April 1, 2022—four days before the defendant's arrest at the apartment on North Hopkins Street—the police department's ALPRs had recorded "the BMW" parked overnight at the North Hopkins Street address. Dkt. No. 39-1 at 9 (¶18); Dkt. No. 39-2 at 9 (¶12).

The warrant applications referenced SA Lindeman's training and experience. Dkt. Nos. 39-1 at 9 (¶19); 39-2 at 9 (¶13). The applications stated that "SA Lindeman knows from training and experience that individuals engaged in the illegal sale and destitution [sic] of controlled substances often keep evidence of their crimes, including controlled substances, scales, and drug paraphernal [sic] in vehicles in order to not

7

maintain this evidence at their residence." Dkt. Nos. 39-1 at 9 (¶19); 39-2 at 9 (¶13). The applications stated that "SA Lindeman [] knows that individuals engaged in this type of criminal activity especially like to store evidence of their crimes in vehicles that are not registered to them or that are rental vehicles." Dkt. Nos. 39-1 at 9 (¶19); 39-2 at 9 (¶13). The applications asserted that "[i]ndividuals do this to distance themselves from the incriminating items and provide deniability." Dkt. Nos. 39-1 at 9 (¶19); 39-2 at 9 (¶13).

The applications each had an "Attachment B," which listed the "Particular Things to be Seized." Dkt. Nos. 39-1 at 11; 39-2 at 11. "Attachment B" is ten pages long—longer than the warrant application. The "things" to be seized included records or information relating to who owned or occupied the "premises;" guns (and ammunition, magazines, attachments or cases); indicia of the possession, use or distribution of controlled substances (including paraphernalia); and "[c]omputers, cell phones, tablets, or storage media used as a means to or assist in obtaining the means of committing the violations described . . . ." Id. at ¶4. Using the word "computer" to refer generally to computers, cell phones, tablets or storage media, id. at ¶5, "Attachment B" listed many types of "computer"-related items to be seized, id. at ¶¶5(a)-(m). In particular, "Attachment B" stated that the application sought to search for "data stored on a computer's hard drive or other storage media." Id. at 14 (¶1). It stated, "the warrant applied for would authorize the seizure of

8

electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B)."[2] Id.

There then followed a separate "*Probable cause*" section. Id. at 14 (¶2). This section stated:

> 2.　　*Probable cause*. I submit that if a computer or storage medium is found on the Subject Locations, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:
>
> (a) Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or year later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.
>
> (b) Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.
>
> (c) Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives— contain electronic evidence of how a computer has been

---

[2] Fed. R. Crim. P. 41(e)(2)(B) states only that in the case of a warrant seeking electronically stored information, the warrant "may authorize the seizure of electronic storage media or the seizure or copying of electronically stored information. Unless otherwise specified, the warrant authorizes a later review of the media or information consistent with the warrant. The time for executing the warrant in Rule 41(e)(2)(A) and (f)(1)(A) refers to the seizure or on-site copying of the media or information, and not to any later off-site copying or review."

used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operation system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

(d) Similarly, files that have been viewed via the internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

Id. at 14-15 (¶¶2(a)-(d)).

"Attachment B" went on to request authorization to search for and seize forensic electronic evidence showing how the "computers" were used, the purpose of the use, who used them and when. Id. at 15 (¶3). It also asked for authorization to seize, image or copy storage media that "reasonably appear to contain some or all of the evidence described in the warrant . . . ." Dkt. No. 39-1 at 20 (¶5); Dkt. No. 39-2 at 19 (¶5). Finally, "Attachment B" observed that several people "share the Subject Locations as a residence," so it was "possible" that the "Subject Locations [would] contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime." Dkt. No. 39-1 at 20 (¶6); Dkt. No. 39-2 at 19 (¶6). "Attachment B" stated that even in that instance, "[i]f it is nonetheless determined that that [sic] it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well." Id.

10

B.    Issuance of the Warrants

On April 5, 2022—the same day the defendant was arrested, and the same day SA Lindeman signed the applications—Magistrate Judge Stephen C. Dries approved both search warrants. Dkt. Nos. 39-1 at 1; 39-2 at 1.

C.    The Defendant's Motion to Suppress and Judge Duffin's Recommendation

On June 3, 2024, the defendant filed a motion to suppress all evidence recovered from the three vehicles and all cell phone evidence. Dkt. No. 39. The defendant argued that the warrant to search the three vehicles was "invalid because it lacks probable cause and fails to set forth a sufficient nexus between what officers were searching for (evidence of drug distribution/felon in possession) and the places to be searched (the cars)." Id. at 1. The defendant contended that the warrant for the vehicles (1) "doesn't establish probable cause that [the defendant] is engaged in drug distribution[;]" (2) "doesn't contain probable cause that [the defendant] is possessing firearms as a felon[;]" (3) "fails on particularity grounds because it allows for the search of three separate vehicles each having no connection to any alleged illegal activity" and (4) "fails to set forth facts establishing a nexus between the cars, [the defendant], and evidence of drug distribution/illegal gun possession." Id. at 10.

The defendant reported that "[b]etween the two warrants, officers ended up seizing a total of five phones." Id. at 1. The defendant asserted that both search warrants lacked probable cause because they "fail to establish that [the defendant] had such devices, that they would be within apartment and cars, or that any devices would contain evidence of drug distribution or firearms

11

possession." Id. at 11. He argued that neither warrant application established that he owned or used a cell phone, citing United States v. Griffith, 867 F.3d 1265, 1272 (D.C. Cir. 2017)). He argued that the warrants were overbroad because "they allow for the exploratory search of the entire contents of the phones" and "they are unconstrained as to a timeframe." Id. at 14.

After the parties had fully briefed the motion, Judge Duffin issued a report recommending that this court deny it. Dkt. No. 48. Judge Duffin determined that "[t]he guns and drugs observed in the apartment provided probable cause to believe that the occupants were involved in the distribution of controlled substances." Id. at 4. He stated:

> The photograph of the suspected marijuana and heroin depicted a quantity of suspected heroin that was consistent with distribution. The firearms were also of the sort commonly possessed by persons involved in the distribution of drugs. The Glock had a high-capacity magazine that extended about 10 inches below the grip. An auto sear was also attached to the Glock (ECF No. 39-2, ¶ 3), a generally illegal device that is capable of turning the pistol into a machine gun.

Id.

Judge Duffin determined that "[t]he rental car further supported an inference of drug dealing[,]" reasoning that "[p]ersons with access to cars—and here the affidavit shows that the two occupants of the apartment had access to two cars—generally do not also rent a car." Id. He recounted SA Lindeman's assertion that people "often use rental cars to distance themselves from activities associated with that car." Id. at 4-5 (citing United States v. Hart, Case No. 16-cr-5, 2016 U.S. Dist. LEXIS 53531, at *11 (E.D. Wis. Apr. 5, 2016)). Judge Duffin concluded that, "[w]ith reason to believe that the occupants of the

12

apartment were involved in the trafficking of drugs, investigators were permitted to follow their training and experience regarding the habits and practices of drug dealers." Id. at 5. He clarified that "[t]his included searching vehicles associated with the occupants of the apartment (see ECF No. 39-2, ¶13) and any cell phones found in the apartment or in the cars." Id.

Turning to the search of the vehicles, Judge Duffin opined that "[d]rug dealers commonly use vehicles in their crimes, and evidence of those crimes will commonly be found in vehicles they use." Id. (citing United States v. Stewart, Case No. 20-CR-56, 2020 WL 7212097, at *5 (E.D. Wis. May 13, 2020), report and recommendation adopted in part, overruled in part, Case No. 20-CR-56, 2020 WL 6255676 (E.D. Wis. Oct. 23, 2020)). Judge Duffin stated that "[t]he relationship between how local drug dealers commonly use vehicles to avoid detection is well-understood by all in the criminal justice system, including judges[,]" and observed that "[i]t has even been highlighted in several media reports in recent years."[3] Id. at 5-6. Judge Duffin asserted that "[t]he

---

[3] Observing that the media recently has highlighted the relationship between how local drug dealers commonly use vehicles to avoid detection, Judge Duffin cited three news articles from the last ten years. See Dkt. No. 48 at 5-6 (citing Ben Jordan, *MPD scales back pursuits for mobile drug traffickers*, TMJ4, May 22, 2024, https://www.tmj4.com/news/local-news/mpd-scales-back-pursuits-for-mobile-drug-traffickers; John Diedrich, *Ruthless heroin dealers innovated drug dealing with focus on customer service in Milwaukee*, MILWAUKEE JOURNAL SENTINEL, Feb. 16, 2018, https://www.jsonline.com/story/news/crime/2018/02/16/ruthless-heroin-dealers-innovated-drug-dealing-focus-customer-service-milwaukee/343452002; John Diedrich and Ashley Luthern, *Gangs turn to rolling drug houses, exploiting police chase policy*, MILWAUKEE JOURNAL SENTINEL, July 18, 2015, https://archive.jsonline.com/ watchdog/ watchdogreports/gangs-turn-to-rolling-drug-houses-exploiting-policy-chase-policy-b99538779z1-317132501.html).

13

presence of a rental car bolstered the conclusion that the occupants of the apartment were using vehicles in connection with drug trafficking," and that, "[s]o, too, did the image of [the defendant] with a pistol in a BMW." Id. at 6. Judge Duffin explained that, "[a]lthough it was possible that the photo was old or that the BMW was different than the one identified in the warrant, probable cause does not require the negation of innocent explanations." Id. He found that "[a] reasonable inference was that [the defendant] recently had a firearm in the subject BMW[,] [a]nd [the defendant] was prohibited from possessing a firearm." Id. He observed that "[t]he affidavit does not explicitly state that [the defendant] was a convicted felon," but explained:

> [The affidavit] states, "The first Bench Warrant was issued by the Milwaukee Circuit Court on November 23, 2021, in relation to case 2020CF3569. [THE DEFENDANT] is charged in this case with Felon in Possession of a Firearm." (ECF No. 39-1, ¶ 1.) By virtue of this pending charge it is fair to infer that he was previously convicted of a felony and thus prohibited from possessing a firearm.

Id. Judge Duffin concluded "there was probable cause to believe that evidence of a crime would be found in the identified BMW and the other two cars." Id.

As for the cell phones, Judge Duffin determined that the search of the cell phones was supported by probable cause and was not overbroad. Id. at 7-9. He first explained that although cell phones are subject to the warrant requirement of the Fourth Amendment, they are not subject to an "enhanced warrant requirement." Id. at 7 (quoting United States v. Robinson, Case No. 23-cr-212, 2024 WL 3315497, at *2 (E.D. Wis. Apr. 29, 2024)). Judge Duffin stated that "[b]ecause '[c]ellular phones are ubiquitous in life, . . . when a person's life involves drug dealing, evidence of that criminal activity is likely to

14

be found on a person's cellular phone.'" Id. at 7 (quoting Stewart, 2020 WL 7212097, at *6). He recounted that "'circuits throughout the Country have recognized that cell phones are tools of the drug trafficking trade'" and that "'[t]hose engaged in the criminal activity of trafficking contraband regularly employ multiple phones in their trade.'" Id. (quoting Stewart, 2020 WL 7212097, at *6; United States v. Robinson, Case No. 23-CR-212, 2024 WL 2862111, at *6 (E.D. Wis. June 6, 2024)). Judge Duffin observed that "[a]lthough a warrant authorizing the search of every cellphone may result in an infringement of the privacy interest of persons uninvolved in the crime under investigation, this 'is an unavoidable consequence of every warrant to search a residence occupied by multiple people.'" Id. at 8 (quoting Robinson, 2024 WL 3315497, at *2 (E.D. Wis. Apr. 29, 2024), report and recommendation adopted, 2024 WL 2862111)). Judge Duffin continued, "'[a]s a practical matter the only way for law enforcement to identify who owned each phone, or if a particular phone is one identified in the warrant, is through some manner of a search.'" Id. (quoting Robinson, 2024 WL 3315497 at *2). He also recounted that the defendant had "posted an incriminating photograph on Facebook, an application often accessed through a mobile phone[,]" and that "'[a] person who publicly posts one incriminating photo is likely to have taken others, and such photos are likely to be found on a person's phone.'" Id. (quoting Robinson, 2024 WL 3315497 at *2). Judge Duffin stated that, "[b]eyond these general principles, it must be underscored that probable cause was not limited to [the defendant,]" but that the presence of drugs in Apartment #124 supported "the

inference that any occupant of the apartment was involved in the offense of possessing controlled substances with the intent to distribute them." Id. Judge Duffin concluded, "These circumstances further support the search of every phone found (as well as any vehicle associated with the occupants." Id.

Judge Duffin summarized his determination as follows:

> Reading the affidavits as a whole, in a common sense, non-technical manner, *see Aljabari*, 626 F.3d at 944, and especially giving "'great deference' to the issuing judge's finding of probable cause," *United States v. Fifer*, 863 F.3d 759, 764 (7th Cir. 2017) (quoting *United States v. Dessart*, 823 F.3d 395, 400 (7th Cir. 2016)), a substantial basis existed for concluding there was probable cause that evidence of a crime would be found, *Illinois v. Gates*, 462 U.S. 213, 238 (1983), in the apartment, in the three identified vehicles, and on any cellphone located in these locations.

Id. at 9.

D.    The Defendant's Objection

On July 12, 2024, the defendant timely filed an objection to Judge Duffin's recommendation. Dkt. No. 51. The defendant reasserts that the two search warrants had the following deficiencies:

> The overarching problem is the absence of probable cause supporting the searches of the vehicles and the seizure and search of all electronic devices found in the vehicles and in the apartment. The affidavits supporting the warrants contained vague, stale and unsubstantiated information that failed to establish that [the defendant] was probably engaged in drug distribution. The affidavits further failed to connect [the defendant] to the alleged criminal activity and the places and items subject to search (i.e. the vehicles and any electronic devices found in the vehicles and apartment). Relatedly, the warrants were also overbroad and insufficiently particular; they allowed officers to seize any electronic devices found in the apartment or vehicles and search the devices in their entirety without any restrictions.

16

Id. at 2. The defendant reiterates—again, citing the D.C. Circuit's case in Griffith—that the warrant applications were required to demonstrate cause to believe that evidence would be found at the place to be searched. Id. at 4. He contends that Judge Duffin overlooked these problems by impermissibly relying on inferences not contained in the search warrant applications and not supported by facts contained in the applications. Id. at 5-14. The defendant maintains that Judge Duffin "supplement[ed] the affidavits' inadequate factual basis with a string of conclusory allegations and inferences relied upon in other cases to arrive at a finding of probable cause[,]" which he contends "is inconsistent with the Fourth Amendment." Id. at 8. The defendant argues that Judge Duffin's "conclusory allegations about cell phone use in connection with drug distribution are not specific factual allegations, they weren't included in the warrant affidavits, and they can't support such sweeping seizures and searches." Id. at 8-9. He criticizes Judge Duffin's recommendation for "rel[ying] on several assertions and inferences that are unsupported or contradicted by the information in the affidavits." Id. at 9. He challenges Judge Duffin's conclusions about the difficulty law enforcement faces when it recovers phones during a search and does not know who owns them, citing Griffith for the proposition that "it is no answer to confer a blanket authorization to search for and seize all electronic devices." Id. at 14 (quoting Griffith, 867 F.3d at 1276). He argues that, "[u]sing a common-sense approach and considering the information before the court issuing the warrants, the affidavits failed to establish that [the defendant] was probably distributing drugs, and the warrant

17

for the vehicles failed to establish a sufficient nexus between [the defendant], the alleged offenses, the vehicles, and all electronic devices." Id. at 15. Finally, the defendant contends that suppression is the appropriate remedy because "SA Lindeman and the executing officers should have known that the warrants were deficient." Id. at 16.

The government asks this court to adopt Judge Duffin's recommendation and deny the defendant's motion to suppress. Dkt. No. 54 at 2. The government argues that "[p]robable cause existed to search [the defendant]'s vehicles for evidence of a crime, emerging from the totality of the circumstances." Id. at 5. It emphasizes that, "[u]pon entry [into Apartment #124], officers immediately saw multiple drugs and firearms, in direct proximity to three sets of car keys[,]" and recounts that "[t]his physical evidence was found in the context of multiple observations connecting [the defendant] to the vehicles, from the apartment manager (including firsthand observation), automated license plate reader checks, a confidential informant, and a social media post." Id. at 6. The government also states that the officers "knew that none of the three vehicles were registered to [the defendant], and one was a rental car[,]" which it says was noteworthy because "drug dealers" are known "to use vehicles not registered to themselves, rented or otherwise, as a means of distancing from any incriminatory items." Id. (citing Dkt. No. 48 at 3, 5).

Regarding the phones, the government contends that because "officers clearly had a factual basis to believe [the defendant] was involved in drug

18

dealing given the plain-view contraband that they encountered upon entry and the nature of the vehicles when considered from the standpoint of law enforcement training," "searches of his cell phones were reasonable under the Fourth Amendment." Id. at 7. The government asserts that the phones' direct proximity to contraband and the defendant's prior Facebook post showing him holding a firearm strengthened the likelihood that incriminating evidence would be found on the phones. Id. at 7-8. Finally, the government dismisses the defendant's concerns about officers searching the entirety of the recovered phones, observing that "[t]his Circuit has found that officers may be permitted to search all contents of a cell phone when they are unsure where evidence may be found, drawing a comparison to searching an entire filing cabinet for incriminating documents." Id. at 10 (citing United States v. Bishop, 910 F.3d 335, 337 (7th Cir. 2018)).

The defendant replies that "the warrants and supporting affidavits at issue here fail to provide a substantial basis for concluding that searches of the vehicles and all electronic devices would uncover evidence of [the defendant] dealing drugs or illegally possessing firearms." Dkt. No. 56 at 2 (citing United States v. Peck, 317 F.3d 754, 755 (7th Cir. 2003); Illinois v. Gates, 462 U.S. 213, 238-39 (1983)). The defendant contends that Judge Duffin "impermissibly relied on inferences piled on more inferences, rather than on established facts, to conclude that probable cause existed to search the vehicles and any cell phones/electronic devices." Id. at 3. He criticizes the government for "cit[ing] the same chain of speculation rather than pointing to specific facts showing

19

that [the defendant] was engaged in drug distribution and establishing a nexus between [the defendant], the alleged illegal activity, and the cars and phones." Id. In challenging the search of the recovered phones, the defendant claims that "[l]aw enforcement couldn't describe which electronic devices it was seizing with particularity or narrow the scope of the searches because there wasn't probable cause to believe any device contained evidence of drug distribution or illegal gun possession in the first place." Id. at 6. The defendant asserts that "[b]oth warrants were defective because the affidavits failed to set forth facts connecting the seized phones to [the defendant] and the alleged illegal activity, they contained stale, unsubstantiated, and/or immaterial information, and they were overbroad." Id. at 8. Finally, "[i]n light of the absence of any conclusions in the Recommendation as to good faith and the government's choice not to address the issue, [the defendant] asks that this Court treat good faith as forfeited, if not waived, and rule in his favor as to the deficiencies in the warrants and suppression." Id.

> E. Supplemental Briefing

On January 13, 2025, the court held a hearing to tell the parties that it would be denying the motion to suppress with respect to the search of the vehicles and to express its concerns regarding the search of the cell phones. Dkt. No. 59. The court explained that the probable cause statement did not reference the cell phones. Dkt. No. 58. The court expressed concern that the warrant was too broad, allowing officers to seize all cell phones. Id. It explained that the officers did not obtain a separate warrant to search the contents of the

20

phones and that the parties' briefs did not address the good faith or inevitable discovery doctrines. Id. The court allowed the parties to file supplemental briefing and excluded time through March 12, 2025. Dkt. No. 59.

The government's supplemental brief includes *color* copies of the photos included in the applications, showing what the officers observed in plain view while conducting the protective sweep.[4] Dkt. No. 60 at 4. The color photo on page four of the government's brief shows one cell phone lying screen-side down next to the baggies with the drugs and what appears to be a second phone, lying screen-side up, underneath the first. Id. A second color photo shows the two firearms—one with a high-capacity magazine extending well below the grip—on the ledge in the kitchen. Id. at 5. The applications explained that the baggies containing the suspected marijuana and heroin were located some five to six feet from the firearms. Id. at 5.

The government argues that the presence of drugs and guns created a reasonable belief that drug trafficking was occurring at the residence, and that there was probable cause to believe that a cell phone—a "tool of the trade"— located next to the guns and drugs would contain evidence of the drug trafficking. Id. at 6. The government points out that the applications contain a reference to the defendant's Facebook post of a selfie in which he is inside one of the searched vehicles, holding a firearm. Id. at 7. The government argues

---

[4] The version of the warrant provided to the court as attachments to the defendant's motion to suppress were in black and white, but the original warrant submitted electronically to Judge Dries included color photos. The black and white copies made it difficult for the court to see the phones and what was contained in the baggies.

that the officers had a clear and articulable basis for believing that drug trafficking likely was occurring in the residence and vehicles and that there was probable cause to search the phones also found there. Id. The government reiterates the Seventh Circuit's analogy between the cell phones and a filing cabinet, in which the incriminating evidence could be found on any phone, or in any file or folder. Id. at 8. The government states, "[I]f the warrant 'cabins the things being looked for by stating what crime is under investigation,' it is enough." Id. (citing Bishop, 910 F.3d at 337).

The government spends some time distinguishing Griffith, the D.C. Circuit case upon which the defendant relies. Id. at 8-11. It explains that Griffith involved allegations of a year-old gang-related murder, not drug trafficking. Id. It says that the warrant in Griffith "gave no reason to suppose that Griffith either had a cell phone or, if he did, the phone would contain incriminating evidence of his involvement in the murder." Id. at 9. It explains that in Griffith the government used the "nearly everyone has a cell phone and cell phones contain lots of information about the owner's life so suspected involvement in a crime justifies searching for cell phones" argument, but that the D.C. Circuit rejected it, in part because "the warrant lacked probable cause and also that the warrant was overbroad." Id.

The government cites United States v. Anderson, Case No. 23-CR-9, 2024 WL 4198673 (N.D. Ind. Sept. 16, 2024), as a case in which a defendant charged with drug trafficking relied on Griffith. Id. It explains that the in Anderson emphasized that the context mattered, because Griffith didn't involve

widespread drug trafficking. Id. (quoting Anderson, 2024 WL 4198637, at *7). The judge in Anderson concluded that cell phones were "known and obvious drug trafficking tools," and relied on the "long-established association between cell phones and narcotics trafficking" and acknowledged that the same types of associations cannot be make for all crimes. Id. 9-10 (citing Anderson, 2024 WL 4198637, at *9). The government emphasizes that the Anderson court rejected the same overbreadth argument that the defendant makes in this case, reasoning that criminals in drug trafficking enterprises "do not nearly label which cell phone belongs to whom." Id. at 10 (also citing United States v. Vizcarra-Millan, 15 F.4th 473, 503 (7th Cir. 2021). The government explained that Judge Stadtmueller had reached a similar conclusion in the case Judge Duffin had discussed, Robinson, 2024 WL 2862111, at *4. Id. at 10-11.

According to the government, this is not a case where the warrant authorized only the physical seizure of the cell phones. Id. at 11. It points to Paragraph 4 of Attachment B of the warrants, which it says authorizes seizure of the "computers, cell phones, tablets or storage media used as a means to or assist in obtaining the means of committing the violations described" (felon in possession and/or possession with intent to distribute.) Id. (citing Dkt. Nos. 39-1 at 11 (¶4); 39-2 at 11 (¶4)). It recounts that Paragraph 5 authorizes the search of the device but also the contents of the device. Id. at 11 (citing Dkt. Nos. 39-1 and 39-2 at p. 14). The government says that Attachment B contains a list of the contents that could be seized, including the phone number and email address associated with the phone, text messages and photos

23

consistent with drug trafficking and firearms (including those showing that [the defendant] was the sender of those texts." Id.

Finally, the government argues that there is a presumption that affiant Agent Lindeman acted in good faith applying for the warrant. Id. at 14. The government asserts that the defendant has not sufficiently met his heavy burden to overcome that presumption. Id. It says that the defendant has not argued police misconduct (beyond the lack of probable cause), that Judge Dries was biased or that Agent Lindeman was reckless or dishonest. Id. The government contends that, to the extent that the defendant argues that the warrant was "so lacking in probable cause as to render official belief in its existence entirely unreasonable," even if the warrant lacked probable cause, it "is certainly is [sic] not so bare boned or lacking in indicia of probable cause as to render official belief in its existence inevitable." Id. The government maintains that the very fact that Agent Lindeman sought a warrant is *prima facie* evidence of his good faith in believe that there was probable cause to search the phones, and that Judge Dries agreed. Id.

The government argues that the inevitable discovery doctrine applies, as well, because during their protective sweep of the residence, the agents observed—in plain view—the firearms, drugs and at least one cell phone. Id. at 14-15. It asserts that the defendant did not challenge the protective sweep, which it says provides an independent, legal justification for conducting a search of the residence and vehicles that would have led to the discovery of the phones. Id. at 15-16. The government maintains that because the lawful search

24

uncovered the phones among the five firearms, ammunition and drugs, law enforcement could have obtained a separate warrant after the search, and that "the contents of the phones would have been inevitable discovered." Id. at 16 (citing United States v. McGill, 8 F.4th 617 (7th Cir. 2021).

The defendant responds that the only "new" information in the supplement is the addition of color photographs, and its assertion that the photographs provided Judge Dries were the color photographs. Dkt. No. 63 at 1 and n.1. He argues, however, that the warrant applications do not explicitly address the cell phones or link the cell phone and its location to him. Dkt. No. 63 at 1. He says that "[a] photograph depicting a cell phone near drugs, without any further mention of the phone or its location in the text of the warrant applications, contributes little, if anything, to the existence of probable cause to seize and search all electronic devices in the apartment and three associated vehicles." Id. at 1-2.

The defendant reiterates that the government relies "primarily on stacked inferences" that are not contained in the warrant applications. Id. at 2. He says those inferences are derived from caselaw, not from the officers' training and experience. Id. The defendant accuses the government of relying on nothing more than a photo, a Facebook post (from months earlier), a general statement that cell phones and drugs go "hand in hand" and an inference that the presence of guns and drugs in one location establishes drug trafficking. Id. at 6. He asserts that "A Facebook photo of Boyd with a gun in the past, and an image of a cell phone without further explanation do not add up to probable

25

cause to seize and search all electronic devices." Id. at 2. He again asserts that the warrants were overbroad in allowing law enforcement to seize and search all electronic devices, "without any limitations based on ownership of the devices or the time period of the content subject to search." Id. The defendant asserts that the warrants are "glaringly overbroad by allowing for the seizure and search of all cell phones on the property and their contents, regardless of ownership and not otherwise restricted by type or content or a specific date range." Id. at 10. The defendant opines that the government reads Attachment B to the warrants "to say far more than it does." Id. at 2. He maintains that Attachment B contains "imprecise assertions and overgeneralizations about electronic devices and the evidence on them as opposed to any details specific to Boyd's case or the crimes under investigation." Id. at 3. The defendant says that Attachment B simply is "boilerplate." Id. He says that the warrant applications don't limit law enforcement's search or seizure in any way. Id. The defendant argues that it would have been prudent to limit the scope, such as limiting to a particular person, cell phone, place within home, data files on the phones. Id. at 10.

Finally, the defendant asks the court to apply the exclusionary rule to deter law enforcement. Id. at 3. He suggests that the warrants in this case were "so lacking in indicia of probable cause that official belief in its existence was unreasonable." Id. at 11. He argues that the warrants lack "even boilerplate assertions about drug distribution and cell phone use." Id. at 12. The defendant contends that the warrants are so facially deficient and overbroad

that the executing officers could not have presumed them to be valid. Id. at 12. He suggests that the overbreadth is underscored by the fact that officers seized all devices found in the apartments and cars. Id. at 13. With respect to the inevitable discovery doctrine, the defendant argues that the government waived any inevitable discovery argument because the government didn't present the magistrate judge with any evidence of inevitable discovery. Id. at 14. The defendant disputes the argument that the police had an independent basis for seizing and searching the phones, arguing again that the officers relied on flawed warrants. Id. at 16.

In its reply brief, the government observes that the defendant did not respond to its arguments distinguishing Griffith. Dkt. No. 64 at 2. It also clarifies that it did not *waive* the inevitable discovery argument; it *forfeited* the argument. Id. at 3. The difference, the government says, is that waiver is the intentional relinquishment of a known right while forfeiture results from an oversight. Id. (citing United States v. Flores, 929 F.3d 443, 447 (7th Cir. 2019)). The government emphasizes, however, that courts may consider a forfeited argument when "concerns broader than those of the parties" warrant it, reminding the court that *the court* asked the parties to address the doctrine in supplemental briefing. Id. (quoting Wood v. Milyard, 566 U.S. 463, 471 (2012)).

## II.  **Legal Standard**

Federal Rule of Criminal Procedure 59(b) governs a district court's referral of motions to suppress to magistrate judges. Parties have fourteen days to file "specific objections" to a magistrate judge's report and recommendation

27

regarding a motion to suppress. Fed. R. Crim. P. 59(b)(2). When reviewing a magistrate judge's recommendation, the district judge must review *de novo* the portions of the recommendation to which a party timely objects. 28 U.S.C. §636(b)(1); Fed. R. Crim. P. 59(b)(2), (3). The court may "accept, reject or modify, in whole or in part, the findings or recommendations made by the magistrate." 28 U.S.C. §636(b)(1). That said, when a court reviews a challenge to a search authorized by a warrant, "the right inquiry is whether the judge who issued the warrant . . . acted on the basis of probable cause," and the reviewing court "must afford 'great deference' to the issuing judge's conclusion." United States v. McIntire, 516 F.3d 576, 578 (7th Cir. 2008). A reviewing court "afford[s] 'great deference' to the probable cause finding made by the judge who evaluated the warrant application in the first instance and will uphold that determination so long as there is a 'substantial basis' for concluding 'that a search would uncover evidence of wrongdoing.'" United States v. Yarber, 915 F.3d 1103, 1105 (7th Cir. 2019) (quoting Gates, 462 U.S. at 236).

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and states that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "Probable cause for a search warrant exists when the supporting affidavit presents a total set of circumstances creating a 'fair probability' that evidence

of a crime will be found." United States v. Zamudio, 909 F.3d 172, 175 (7th Cir. 2018) (quoting Gates, 462 U.S. at 238).

"When an affidavit is the only evidence presented to support a search warrant, the validity of the warrant rests solely on the strength of the affidavit." United States v. Carswell, 996 F.3d 785, 791 (7th Cir. 2021) (citing United States v. Orozco, 576 F.3d 745, 748 (7th Cir. 2009)). "An affidavit supporting a search warrant is presumed valid." United States v. Taylor, 63 F.4th 637, 649 (7th Cir. 2023) (citing United States v. Jones, 208 F.3d 603, 607 (7th Cir. 2000)). "A search warrant affidavit establishes probable cause when, based on the totality of the circumstances, it sets forth sufficient evidence to induce a reasonably prudent person to believe that a search will uncover evidence of a crime." United States v. Curry, 538 F.3d 718, 729 (7th Cir. 2008) (quoting United States v. Mykytiuk, 402 F.3d 773, 776 (7th Cir. 2005)).

"When considering an application for a warrant, the task of the issuing judge 'is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" Taylor, 63 F.3d at 651 (quoting Gates, 462 U.S. at 238). See also United States v. Reichling, 781 F.3d 883, 887 (7th Cir. 2015) (holding that in evaluating warrant applications, judges may consider what "is or should be common knowledge," and that judges need not "pretend they are babes in the woods" when vetting probable cause). "The Government need not provide direct

29

evidence that fruits of the crime or other evidence will be found in the location specified: The magistrate judge 'is entitled to draw reasonable inferences about where evidence is likely to be kept,' and he 'need only conclude that it would be reasonable to seek the evidence in the place indicated in the affidavit.'" Curry, 538 F.3d at 729 (quoting United States v. Sleet, 54 F.3d 303, 306 (1995)). See also, United States v. Aljabari, 626 F.3d 940, 944 (7th Cir. 2010) ("direct evidence linking a crime to a particular place, while certainly helpful, is not essential to establish probable cause to search that place.").

A judge "evaluating a warrant application is entitled to take an officer's experience into account in determining whether probable cause exists." Orozco, 576 F.3d at 749 (citing United States v. Lamon, 930 F.2d 1183, 1189 (7th Cir. 1991)); see also United States v. Elst, 579 F.3d 740, 746 (7th Cir. 2009) ("Experienced law enforcement officers (as well as experienced magistrates) are permitted to draw reasonable inferences from the facts based on their training and experience."). On the other hand, a judge "may not rely solely upon 'conclusory allegations' or a 'bare bones' affidavit in issuing a warrant." Carswell, 996 F.3d at 791 (citing Curry, 538 F.3d at 729).

## III.    Discussion

### A.    Search of Vehicles

Based on the content of the warrant application,[5] there was probable cause to search the three vehicles parked outside Apartment #124 (the Nissan,

---

[5] Because this section addresses only the search warrant for the three vehicles, the court will reference and cite in this section only that specific search warrant application. See Dkt. No. 39-1.

the Volkswagen and the BMW). The facts described in the warrant application, and the reasonable inferences drawn from those facts, created a "fair probability" that evidence of a crime would be found in the three vehicles. See Zamudio, 909 F.3d at 175.

The warrant application detailed facts that linked the defendant—more broadly, the defendant and Stirgus-Harris—to the three vehicles. Although none of the vehicles were registered to the defendant and only one was registered to Stirgus-Harris, on April 5, 2022, law enforcement found the keys to all three vehicles on the couch in the living room of Apartment #124, where Stirgus-Harris answered the door and where officers arrested the defendant. Dkt. No. 39-1 at 4, 8 (¶¶7-8, 11). All three vehicles were parked in the parking lot of the apartment complex containing Apartment #124. Id. at 8 (¶11). One of the three vehicles—the Volkswagen—was registered to Stirgus-Harris, the person who opened the door to Apartment #124 when officers knocked. Id. at 4, 8 (¶¶8, 13). Both the day before the defendant's arrest and the day of the arrest (after officers had taken the defendant into custody), the apartment manager told officers that the manager had seen the defendant drive the Volkswagen "many times" in the previous weeks. Id. at 8 (¶15). This evidence was sufficient to link both Stirgus-Harris and the defendant to the Volkswagen.

Law enforcement found the keys to the Nissan rental car on the living room couch in Apartment #124 (where the defendant was arrested), and the Nissan was parked in the lot outside that apartment. Again, both the day before the defendant's arrest and the day of his arrest (after the defendant had

been taken into custody), the apartment manager reported having seen the defendant driving the Nissan "many times" in the weeks prior to the arrest. Id. at 8 (¶15). This evidence was sufficient to link the defendant to the rented Nissan.

The apartment manager also told officers that the manager knew that the BMW was related to Apartment #124 (although the reason the affiant gave for why the manager knew this makes no sense). Id. A confidential informant told officers that the informant had seen the defendant driving the BMW in August 2021 (about eight months before the defendant's arrest). Id. at 9 (¶17). In October of 2021 (about six months before the defendant's arrest), the Milwaukee Police Department-operated ALPRs (Automated License Plate Reader) recorded the BMW parked overnight at the residence of a known girlfriend and mother of one of the defendant's children. Id. at 9 (¶18). In February 2022 (about two months before the defendant was arrested), the defendant posted a photo of himself sitting in a BMW—with a firearm—on Facebook, where it could be viewed by the public. Id. at 8-9 (¶16). And on April 1, 2022—four days before the defendant's arrest at the apartment on North Hopkins Street—the ALPRs recorded "the BMW" parked overnight at the North Hopkins Street address. Id. at 9 (¶18).

As the court will discuss below, the defendant disputes the evidentiary impact of the February 2022 Facebook post. See Dkt. No. 39 at 5 (n.1); 51 at 12-13. But although the warrant application contains no evidence proving that the photo in February 2022 Facebook post depicts the defendant holding a gun

while sitting in the *same* BMW whose keys law enforcement found in Apartment #124 and which was parked outside Apartment #124, combined with other information connecting a BMW with the defendant in the eight months before the defendant's arrest, the photo provides circumstantial evidence connecting the defendant to that particular BMW.

The warrant application also included facts and circumstances, which—when considered together—allow an issuing judge to reasonably infer that the three vehicles would contain evidence of a crime. First, law enforcement found the keys to all three vehicles in Apartment #124, where officers had arrested the defendant on two active bench warrants, one of which was issued in a case where the defendant had been charged with being a "Felon in Possession of a Firearm." Dkt. No. 39-1 at 4, 8 (¶¶7, 11). Law enforcement observed the keys "[l]ocated next to the suspected drugs on the couch—a "baggie containing green leafy substance (suspected marijuana) and a baggie of tan substance (suspected heroin)[.]" Id. at 5-8 (¶¶10-11). Law enforcement found the drugs and keys on a couch "located approximately 5-6 feet from the counter" where officers found the two firearms. Id. at 4-8 (¶¶9-11); see also United States v. Bryant, 420 F.3d 652, 657 (7th Cir. 2005) (holding that the finding of guns in close physical proximity to drugs "presumptively establish[es] a nexus between the firearms and drug activity"). The keys' proximity to these firearms and suspected drugs cast the three sets of car keys in "a suspicious light." C.f. United States v. Correa, 908 F.3d 208, 216 (7th Cir. 2018) ("The police 'may have probable cause to seize an ordinarily innocuous object when the context

33

of an investigation casts that item in a suspicious light.'" (quoting <u>United States v. Cellitti</u>, 387 F.3d 618, 624 (7th Cir. 2004)).

Second, two of the vehicles were not registered to either the defendant or Stirgus-Harris. One of those two vehicles was a rental car with Florida plates. The apartment manager reported having seen the defendant driving that car "many times" in the weeks prior to the defendant's arrest. There is, of course, nothing unlawful about driving a rental car. But the warrant affidavit contains evidence that the defendant also had access to Stirgus-Harris's Volkswagen (the apartment manager reported the defendant driving it "many times" in the week prior to his arrest) and evidence that in the eight months prior to the defendant's arrest, a BMW had been parked near places associated with him (and that, on one occasion, a source had reported seeing him drive a BMW). Driving a rental car looks more suspicious when the person driving it appears to have access to at least one, and possibly two, other cars.

The second of those cars was registered to an Isaiah Bonds on West Juneau Avenue in Milwaukee. The warrant application does not explain whether or how Bonds may have been connected to either the defendant or Stirgus-Harris. But it is eyebrow-raising that the keys to a car that does not appear to have belonged to either of the people who were in Apartment #124 on the day of the defendant's arrest would be found on the couch in that apartment next to drugs and near guns, and that the car itself would be parked in the lot outside that apartment. It further raises an eyebrow that the car was a BMW, when eight months earlier, an informant had seen the defendant

34

driving a BMW; when six months earlier, a BMW had been seen parked at the residence of the mother of one of the defendant's children; when two months earlier, a photo of the defendant sitting in a BMW with a gun had appeared on Facebook; and when four days earlier, a BMW had been parked at the North Hopkins Street apartment building.

Third, the February 2022 Facebook post of a photo of the defendant "inside of a BMW" while he "ha[d] a firearm" shows that, at some point in time, the defendant had a gun in a car—a car of the same make as the car parked outside the North Hopkins Street apartment building on the day of the defendant's arrest, the keys to which law enforcement found in the apartment where he was arrested, next to drugs and guns. The defendant contends that the photo was "posted to Facebook a couple of months before [the defendant]'s arrest" and that "it's unclear when it was taken or what [the defendant]'s felony status was at the time." Dkt. No. 51 at 12. But the warrant application avers that in a Milwaukee County Circuit Court case charged in 2020, the court had issued a bench warrant for the defendant. The application avers that the charge pending in that case was a charge of being a felon in possession of a firearm—a charge that would require the State to have evidence that the defendant had a prior felony conviction and thus was prohibited from possessing firearms. And the warrant application averred that the court issued the bench warrant on November 23, 2021—two or three months before the photo appeared on Facebook.

So: an individual subject to two arrest warrants—one issued in a case where he had been charged with being a felon in possession of a firearm and one issued in a case where he had been charged with bail jumping, vehicular fleeing and four counts of recklessly endangering safety—is found in an apartment with suspected marijuana, suspected heroin and two firearms (one with an extended magazine and a conversion switch). Next to the drugs and feet from the guns are three sets of car keys; the three vehicles those keys operate are parked outside but none of the cars are registered to this individual. The building manager reports that the individual has driven two of the cars frequently in the past few weeks. One of the cars is a rental car, yet the building manager reports that the individual also frequently drives the other (which is registered to the other person in the apartment). The third vehicle happens to be the same make as a vehicle in which the individual was photographed holding a gun—a photograph that appeared on a publicly-viewable Facebook page a couple of months after a court had issued a bench warrant for the defendant's arrest in a case charging him with being a felon in possession of a firearm.

Do all these facts constitute probable cause to believe that contraband or evidence of a crime (in this case, most likely possession of a firearm by a person previously convicted of a felony or possession of controlled substances with intent to distribute them) would be found in the three cars? Given the standard the court must apply, it concludes that the answer to this question is yes.

36

As explained above, this court must accord Judge Dries's probable cause determination great deference and must uphold it as long as there is a "substantial basis" for concluding "that a search would uncover evidence of wrongdoing." The application Judge Dries reviewed was presumed to be valid. He was required to consider the totality of the circumstances, then make a commonsense determination about whether those circumstances raised a fair probability that contraband (in this case, most likely guns, drugs or items ancillary to guns or drugs) or evidence of a crime would be found in the cars. The government wasn't required to present direct evidence that the contraband or evidence *would* be found in the cars; Judge Dries was entitled to draw reasonable inferences about where evidence would be kept, he did not need to pretend to be a babe in the woods and he needed only to conclude that it would be reasonable to look for contraband or evidence in the cars.

Under that standard, the facts the court has recounted were sufficient to allow Judge Dries to reasonably conclude that there might be evidence—perhaps ammunition, perhaps a gun case, perhaps paperwork showing who purchased or owned the guns, perhaps drug paraphernalia—in the cars. The defendant protests that the sole reason Agent Lindeman gave for wanting to search the cars was because, in his experience, people engaged in the illegal sale and distribution of controlled substances often keep evidence of their crimes in their cars. Dkt. No. 39 at 4. The defendant (accurately) points out that this assumes that the marijuana and heroin found on the couch in the apartment were not for personal use. Id. He argues that the application did not

37

contain any information supporting that assumption—it did not recount the weight of the drugs, did not state that officers found paraphernalia or large amounts of cash, did not assert that officers had information from informants or customers that the defendant was a drug dealer. Id. In the defendant's opinion, "the photographs show that the quantity of drugs involved was small and there were rolling papers nearby." Id.

The defendant is correct that the warrant application contained none of this information. But his conclusion that the "quantity of drugs involved was small" is just that—a conclusion. The single photograph in the application shows two "zip-top" baggies that, compared to other items on the couch, appear to be sandwich-sized. The color photo (Dkt. No. 60 at 4) shows that each of the baggies contains multiple, separately wrapped parcels. Judge Dries could use his common sense and his experience in drug cases to decide whether he believed a sandwich-sized baggie containing multiple smaller parcels of separately wrapped heroin likely was for personal use. He also could consider the fact that law enforcement found the drugs a few feet away from two pistols, one of which had both an extended magazine and an auto-sear. He could use his common sense and experience to draw the reasonable inference that someone using drugs in a private home would be less likely to have that kind of firepower than someone selling those drugs. See United States v. Spaulding, 366 F. App'x 670, 673 (7th Cir. 2010) ("[T]here is a frequently noted, well-known connection between guns and drugs: 'weapons are tools of the

trade of drug dealers.'" (quoting United States v. Cooper, 19 F.3d 1154, 1163 (7th Cir. 1994)).

The defendant also argues that the application didn't identify any facts showing probable cause of illegal gun possession. Dkt. No. 39 at 5. As the court has explained, that is not entirely accurate. The reason the U.S. Marshals Service fugitive task force was at the North Hopkins Street apartment that morning was because the Milwaukee County Circuit Court had issued a bench warrant for the defendant's arrest in a case where he had been charged with possessing a firearm after having been convicted of a felony. For the State to charge the defendant with that offense, there had to be evidence that he previously had been convicted of a felony and thus could not legally possess a firearm. Judge Dries was not required to find beyond a reasonable doubt that the defendant *had* a felony conviction; he needed only look at the totality of the circumstances to determine whether there was a fair probability that any gun the defendant possessed would be contraband. The application raised more than a fair probability. The application included the case number of the case in which the bench warrant was issued; it was a 2020 case number, which meant that Judge Dries could reasonably infer that as of 2020, the defendant had a prior felony conviction. The application listed the date on which the state court issued the bench warrant—November 2021—and revealed that in February 2022 (three months or so later), a photo had appeared on the defendant's Facebook page showing him in a BMW with a gun. And Judge Dries knew that task force officers had found two guns—again, one with an extended magazine

39

and an auto-sear—in the apartment where the defendant had been arrested. Considering the totality of these circumstances, Judge Dries could use his common sense and experience to draw the reasonable inference that the defendant was prohibited from possessing a gun, that he'd possessed a gun in a car at least once and that it would be reasonable to look for evidence related to him possessing guns in the cars whose keys were found in the apartment and which were parked outside of it on the day of his arrest in an apartment in which officers had found two guns.

There was a "substantial basis" for Judge Dries to conclude that a search of the three vehicles would uncover evidence of wrongdoing. See Yarber, 915 F.3d at 1105.

    B.    <u>Search of Cell Phones</u>

        1.    *Probable Cause*

The government stated in its brief in opposition to the motion to suppress that law enforcement recovered a total of five cell phones, two of which were recovered from the vehicles. Dkt. No. 42 at 3. That means that they recovered three cell phones from the apartment. The warrant applications contained no information from confidential sources or informants saying that the defendant used cell phones, and did not mention any witnesses who reported seeing the defendant using cell phones in connection with any criminal activity. The applications explained that the ATF special agent, who was a member of the U.S. Marshals Service Fugitive Taskforce, had arrested the defendant and seen the Glock with extended magazine and attached auto

40

sear, a 9 mmm pistol and baggies with suspected marijuana and heroin. Dkt. Nos. 39-1 at 3 (¶5); 39-2 at 3 (¶5). But the applications included a color photo of one cell phone lying next to baggies of drugs on the couch and what appears to be a second cell phone lying underneath the first. Dkt. No. 60 at 4, 5. The applications stated that the baggies of drugs on the couch were five to six feet from the firearms. Dkt. No. 39-1 at 7 (¶10); Dkt. No. 39-2 at 7 (¶4).

The defendant argues that the affidavit and attachments "fail to establish that [the defendant] had such devices [cell phones], that they would be within apartment and cars, or that any devices would contain evidence of drug distribution or firearms possession." Dkt. No. 39 at 11. The defendant glosses over the fact that both warrant affidavits included the photo taken in the North Hopkins Street apartment at the time of his arrest. That photo shows two cell phones next to drugs. The applications include a second photo showing two guns on the kitchen ledge, and both applications aver that those guns were located five to six feet from the drugs (and the phones). The defendant also glosses over the fact in late February 2022—about two months before his arrest in the apartment where the photos were taken and where the officers saw the two phones—a photo appeared on the defendant's Facebook page, showing him inside a car, with a gun. That fact raises an inference that the photo was taken with a cell phone camera. The totality of those facts—that someone had used a cell phone to take a photo of the defendant in car associated with him and in possession of a gun, and that in the apartment where the defendant was arrested there were two phones in close proximity to guns and drugs—raises

41

an inference that the defendant likely owned or had access to at least one cell phone, and an inference that any cell phone(s) law enforcement might find in the apartment where officers had observed the phones, as well as in cars associated with him, might contain evidence of illegal gun possession and/or drug activity.

As the government has observed, the defendant relied heavily on the D.C. Circuit's ruling in Griffith, 867 F.3d at 1265, in some of his briefing. In Griffith, the police obtained a warrant to search the defendant's residence in connection with a gang-related homicide committed more than year earlier. Id. at 1268. There, the government's argument in support of probable cause to search the apartment "rest[ed] on the prospect of finding one specific item there: a cell phone owned by Griffith." Id. at 1270. The court found, however, that the warrant application "provided virtually no reason to suspect that Griffith in fact owned a cell phone, let alone that any phone belonging to him and containing incriminating information would be found in the residence." Id. The court observed that the warrant nonetheless "authorized the wholesale seizure of all electronic devices discovered in the apartment, including items owned by third parties." Id. at 1271. Given those circumstances, the court concluded that the warrant was not supported by probable cause and was unduly broad. Id.

The D.C. Circuit Court of Appeals emphasized that to justify a search of the apartment and seizure of any cell phone, the officers must think that the defendant possessed a phone and that there would be incriminating evidence about his suspected offense:

42

. . . That brings us back to the warrant application's reliance on cell phones—in particular, on the possibility that Griffith owned a cell phone, and that his phone would be found in the home and would contain evidence of his suspected offense. With regard to his ownership of a cell phone, it is true that, as the Supreme Court recently said, cell phones are now "such a pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude they were an important feature of human anatomy." *Riley* [*v. California*, ___ U.S. ___,] 134 S.Ct. [2473], at 2484 [(2014)]. We do not doubt that most people today own a cell phone.

But the affidavit in this case conveyed no reason to think that Griffith, in particular, owned a cell phone. There was no observation of Griffith's using a cell phone, no information about anyone having received a cell phone call or text message from him, no record of officers recovering any cell phone in his possession at the time of his previous arrest (and confinement) on unrelated charges, and no indication otherwise of his ownership of a cell phone at any time. To the contrary, the circumstances suggested Griffith might have been less likely than others to own a phone around the time of the search: he had recently completed a ten-month period of confinement, during which he of course had no ongoing access to a cell phone; and at least one person in his circle—his potential co-conspirator, Carl Oliphant—was known not to have a cell phone.

Id. at 1272-73.

In contrast, this defendant was arrested in an apartment where officers observed—in plain view—phones lying next to drugs and near guns. There was only one other person in that apartment at the time—Stirgus-Harris—implying that the phone or phones belonged either to the defendant, to Stirgus-Harris or to both of them. The application also referenced the photo posted on the defendant's Facebook page in which he was holding a firearm while in a BMW. "Common sense in the modern age dictates that such photos were almost certainly posed from a cell phone." Robinson, 2024 WL 2862111, at *6 (E.D. Wis. June 6, 2024) (citing Reichling, 781 F. 3d at 887). There were BMW keys on the couch next to the drugs and the phones, and a BMW parked in the

43

apartment complex parking lot. A confidential informant had seen the defendant driving a BMW in August 2021 and the APLR had recorded the BMW parked overnight at the North Hopkins Street address days earlier. These facts imply that the photo posted on the defendant's Facebook page was taken inside a car he controlled, either by someone who knew him or by the defendant. Unlike the application in <u>Griffith</u>, the evidence in this case provided probable cause to believe that the defendant owned, or at least had access to, a cell phone.

The offenses the defendant was suspected of having committed also differentiate the facts in this case from the facts in <u>Griffith</u>, where law enforcement was looking for evidence that the defendant was the getaway driver in a homicide that had occurred a year earlier. The appellate court emphasized that "[b]y the time police sought the warrant" in <u>Griffith</u>, "more than a year had passed" since the homicide. <u>Id.</u> at 1274. It reasoned, "Insofar as Griffith might have used a cell phone to communicate with his associates around the time of the crime, the search of the apartment would be grounded in an assumption that he continued to possess the same phone more than one year later." <u>Id.</u> But, the court explained, <u>Griffith</u> had been in custody for about ten months of that year, and it explained that even if upon his release he'd been able to lay hands on the phone he had before he went into custody, he would have had reason and opportunity to delete any communications he may have had with associates. <u>Id.</u>

In this case, on April 5, 2022, law enforcement had seen drugs, phones and guns in an apartment occupied by the defendant and Stirgus-Harris and had seen keys to cars that were parked outside. They obtained the warrants the same day they made those observations—April 5, 2022. Dkt. Nos. 39-1 at 1; 39-2 at 1. When law enforcement observed them and photographed them, the phones were feet away from the guns, and the Facebook photo gave rise to an inference that any phone associated with the defendant (in cars he drove or in his residence) would contain evidence that he illegally possessed guns. The court already has explained that law enforcement knew that at least as of 2020, the defendant had accrued a felony conviction that prohibited him from owning or possessing firearms. Although the defendant is correct that there is no way to know when the Facebook photo was taken, the fact that it was *posted* in late February 2022 implies that it was taken recently—*after* the defendant had accrued a felony conviction.

The presence of the phones near drugs also gave rise to an inference that any phones associated with the defendant (in cars he drove or in his residence) would contain evidence of drug dealing. The court already has explained that the drugs were packaged in two, sandwich-sized baggies, each containing several smaller, separately wrapped parcels and all within feet of two firearms. The phones officers observed were together and immediately next to the drugs and to the car keys. Law enforcement was aware that the defendant had been seen driving a rental car even though he'd also been seen driving another car. As the court has found, Judge Dries had reason to view these facts as indicia of

45

drug trafficking, not use. As Judge Duffin has recounted, circuit courts around the country have found that cell phones are tools of the drug trade. Other courts in this district have found that cell phones, while "not inherently unlawful," are used in nearly all commercial endeavors, including the drug trade." United States v. Stewart, Case No. 20-CR-56, 2020 WL 6255676, at *5 (E.D. Wis. Oct. 23, 2020). And "those engaged in the criminal activity of trafficking contraband regularly employ multiple phones in their trade." Robinson, 2024 WL 2862111, at *6. "The authorization to seize and search all phones . . . was not merely supported, as was the case in *Griffith*, by the fact that 'most people now carry a cell phone.'" Id. at *7 (quoting Griffith, 867 F. 3d at 1268).

       2.   *Particularity*

Also based on the totality of the circumstances, the search warrants satisfied the Fourth Amendment's particularity requirement. See United States v. Miles, 86 F.4th 734, 743 (7th Cir. 2023) ("[W]arrants are constitutional when they are as 'specific [as the officers'] knowledge allows.'" (quoting Bishop, 910 F.3d at 338)). A warrant is not necessarily rendered "too general" merely because it authorizes law enforcement "to look at every file on [a seized] phone." Bishop, 910 F.3d at 336; see also Archer v. Chisholm, 870 F.3d 603, 617 (7th Cir. 2017) ("If the possible existence of unrelated materials were enough to invalidate a warrant, computer searches would be impossible in drug cases . . . and a host of others."). "A warrant may be thought 'too general' only if some more-specific alternative would have done better at protecting

46

privacy while still permitting legitimate investigation." Bishop, 910 F.3d at 337-38 ("So if the police had known that [the defendant] kept all of his files about the [offense] in a particular cabinet, failure to identify that cabinet in the warrant would . . . violate[ ] the constitutional particularity requirement."). The Seventh Circuit has analogized the search of cellphone to the search of a filing cabinet: "as with filing cabinets, the incriminating evidence may be in any file or folder." Id. It has held that search warrants for cell phones are sufficiently particular "if the warrant cabins the things being looked for by stating what crime is under investigation." Id.

The warrants here are sufficiently particular based on the information available to the officers at the time. See Vizcarra-Millan, 15 F.4th at 502 ("A warrant that may be overbroad in one context may be sufficiently specific where the officers have less reliable information about where, exactly, the evidence is likely to be found." (citing United States v. Vitek Supply Corp., 144 F.3d 476, 481 (7th Cir. 1998))). The defendant has not challenged the probable cause to search the North Hopkins Street address, where (the court assumes) at least two of the five phones were recovered. The court has concluded that the warrant for the search of the cars was supported by probable cause, so law enforcement was authorized to seize phones found in those cars. But although the officers had probable cause to believe that phones seized from the North Hopkins Street apartment or the cards related to the defendant might contain evidence of the defendant's illegal gun possession or of drug trafficking, the officers had no way of identifying which cell phone might contain evidence of

47

wrongdoing or where on the cell phones such evidence might be stored. See Bishop, 910 F.3d at 336 (stating that those accused of crimes "don't advertise where they keep evidence"). As the Seventh Circuit ruled in Bishop, there was not "some more-specific alternative" that officers could have used in searching the recovered phones. See Id. at 337.

Moreover, the warrant "cabin[ed] the things being looked for by stating what crime is under investigation"—"Felon in Possession of a Firearm and Possession with Intent to Distribute a Controlled Substance[,]" dkt. nos. 39-1 at 3, ¶5; 39-2 at 3, ¶5. Paragraph 4 of Attachment B authorized seizure of the device and content with sub-items "a" through "m" listing the particular contents to be seized. Id.

3.     *Inevitable Discovery*

Given these findings, the court need not reach the arguments about good faith and inevitable discovery. But in the interest of completeness, and because the court asked the parties to address the inevitable discovery doctrine, the court will address analyzes the inevitable discovery doctrine as it relates to these facts.

The inevitable discovery doctrine applies when "the challenged evidence ultimately would have been discovered through lawful means." United States v. Eymann, 962 F.3d 273, 288 (7th Cir. 2020). The government must demonstrate "(1) that it had, or would have obtained, an independent, legal justification for conducting a search that would have led to the discovery of the

evidence, and (2) that it would have conducted a lawful search absent the challenged conduct." Id.

The defendant does not dispute that the agents were legally in the apartment to arrest him and that, during the protective sweep, the incriminating nature of the items in plain view was readily apparent. Before the court ordered supplemental briefing, it had concluded that the search of the vehicles was supported by probable cause. Law enforcement had an independent legal justification for conducting a search that would have led to the discovery of the cell phones. While conducting the protective sweep of the apartment incident to the defendant's arrest, law enforcement had seen two phones among the drugs and keys on the couch, feet from the guns and ammunition. They had a valid warrant to search the apartment; during that search they seized the phones they'd observed and a third phone. They had a valid warrant to search the cars, where they found the final two phones and, as the government explains, drugs, mail identifying the defendant, another firearm and more ammunition. Dkt. No. 42 at 3. This evidence was more than sufficient to have supported an application for a warrant to search the contents of the phones.

Although the defendant argues that the government "waived" the inevitable discovery argument by not raising it in opposition to the underlying motion to suppress, the government correctly points out that waiver is the intentional relinquishment of a known right. United States v. Jaimes-Jaimes, 406 F.3d 845, 847 (7th Cir. 2005). Although the government concedes that it

49

*forfeited*—rather than waived—that argument when it failed to timely assert it before Judge Duffin, see United States v. Olano, 507 U.S. 725, 733 (1993), the court asked the government to address the doctrine *before* it issued a ruling, and the defendant had the opportunity to respond that the government's argument.

## IV. Conclusion

The court **OVERRULES** the defendant's objections. Dkt. No. 51.

The court **ADOPTS** Judge Duffin's recommendation. Dkt. No. 48.

The court **DENIES** the defendant's motion to suppress. Dkt. No. 39.

The court will calendar a hearing to discuss dates for a final pretrial conference and a trial.

Dated in Milwaukee, Wisconsin this 11th day of April, 2025.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**

50